1                          UNITED STATES DISTRICT COURT
                           EASTERN DISTRICT OF NEW YORK
2


3     ------------------------------------X
                                          :
4     WILLIAM R. NOLAN,                    :
                                          :  19-CV-00187 (ILG)
5                          Plaintiff,      :
                                          :
6                     v.                   :  225 Cadman Plaza East
                                          :  Brooklyn, New York
7     THE CITY OF NEW YORK, *et al.*,      :
                                          :  March 8, 2019
8                          Defendants.     :
      ------------------------------------X
9

10         TRANSCRIPT OF CIVIL CAUSE FOR MOTION HEARING
               BEFORE THE HONORABLE STEVEN L. TISCIONE
11                 UNITED STATES MAGISTRATE JUDGE

12
      APPEARANCES:
13
      For Plaintiff:              THOMAS RUSSELL PRICE, ESQ.
14                                Borrelli & Associates, PLLC
                                  910 Franklin Avenue
15                                Suite #200
                                  Garden City, New York 11530
16
      For Defendants:            DARREN MICHAEL TROTTER, ESQ.
17                                New York City Law Department
                                  100 Church Street
18                                New York, New York 10007

19    Court Transcriber:         RUTH ANN HAGER, C.E.T.**D-641
                                  TypeWrite Word Processing Service
20                                211 North Milton Road
                                  Saratoga Springs, New York 12866
21

22

23

24

25


      Proceedings recorded by electronic sound recording, transcript
      produced by transcription service.

2

1   (Proceedings began at 2:01 p.m.)

2            THE COURT:  Civil cause for motion hearing, 19-CV-

3   01187, Nolan v. City of New York, et al.

4            Counsel, please state your appearance for the

5   record.

6            MR. PRICE:  Thomas Price of Borrelli & Associates

7   for plaintiff William Nolan.

8            MR. TROTTER:  Darren Trotter, corporation counsel

9   for the City of New York.

10            THE COURT:  All right.  So tell me what's the

11   criminal case involves and why there's an overlap here.

12            MR. PRICE:  Your Honor, the -- starting with the

13   civil case -- just to get to the overlap part, the civil case

14   raises out of the suspension and seizure of Mr. Nolan's

15   handgun license and handguns.  Back in March of 2018, which

16   Kim is a result of his emailing certain executives in the

17   NYPD, fast-forward the criminal case involves a search warrant

18   that was executed on Mr. Nolan in December of 2018.  And

19   during the course of executing that search warrant two

20   firearms and I believe two shotguns were found and two stun

21   guns.  And that was essentially the -- to my understanding,

22   that's the charges that have been brought against him.

23            THE COURT:  So he had firearms seized twice?

24            MR. PRICE:  Yes.  The first was under a suspension

25   notice, not as a result of a warrant; the second was the

3

1  result of a warrant.

2          THE COURT:  And that's what the criminal charges

3  are?

4          MR. PRICE:  That's what the criminal charges are

5  based upon, the warrant and the arrest in December.

6          THE COURT:  Okay.

7          MR. PRICE:  But the criminal charges from December

8  don't relate to the original suspension and the seizure of the

9  handguns.

10          THE COURT:  Except to the extent that the suspension

11  allowed them to prosecute him for unlawful possession of

12  firearms?

13          MR. PRICE:  There -- yes, to an extent except that

14  I'm not sure that -- there are different licenses in New York

15  City, so I'm not sure that the license that was originally

16  suspended, which was for handguns, whether or not that also

17  included the shotguns.  So the -- their basis for going after

18  him for the shotguns I don't think has any direct bearing on

19  the original suspension.

20          THE COURT:  Yeah, I have no idea about that.  Is

21  there a separate license for shotguns?

22          MR. TROTTER:  There are different classifications of

23  licenses.  Obviously, plaintiff here had one of them.  The

24  most comprehensive licenses that would cover [indiscernible]

25  cannot have, there is a license that permits just shotguns.

4

1  But Your Honor is correct.  In a certain -- the reason to try

2  for criminal possession was because his licenses had been

3  suspended by the License Division and pursuant to that

4  suspension notice he was directed to turn over all of his

5  firearms for safekeeping to the NYPD.  Obviously he did not

6  because nine months later when a search warrant was executed

7  at his home additional firearms [indiscernible] that would

8  have been -- so there was only one license that we had from

9  the NYPD.  I was able to confirm that with counsel from the

10  License Division and that was one of the bases for charging

11  him with criminal possession because he had those guns

12  unlawfully because of our process for registering with the

13  NYPD.

14          THE COURT:  But that license would have covered the

15  guns if they hadn't suspended it?

16          MR. TROTTER:  It would have covered the guns.  It

17  has come to my attention that they were never -- you have to

18  have the license and then you have to register the firearms.

19          THE COURT:  Okay.

20          MR. TROTTER:  Based on -- the firearms have to be

21  registered with the NYPD that are attached to the license.  It

22  would appear that the high capacity magazines [indiscernible]

23  registered having been -- and again, I'm operating on limited

24  information because I can't prosecute -- the defendants having

25  been registered and were covered by that license

5

1   [indiscernible -- microphone not activated].

2            THE COURT:  Okay.

3            MR. PRICE:  I just want to make clear also, Your

4   Honor, we don't represent Mr. Nolan on the criminal side.

5            THE COURT:  Sure.

6            MR. PRICE:  The warrant in December was actually an

7   electronic warrant.  They were going in looking for computers

8   and things along those lines for -- based upon allegations

9   that he was I guess making harassing communications.

10           So the warrant itself was not, you know, based upon

11  gun ownership or the suspension.  That --

12           THE COURT:  Okay.

13           MR. PRICE:  -- that came sort of after the fact.

14           MR. TROTTER:  And I do under -- I do -- I was aware

15  that the law was issued for --

16           THE COURT:  Something else.

17           MR. TROTTER:  -- [indiscernible].  However, you

18  know, that was a continuation of conduct --

19           THE COURT:  Well, I'm sure.

20           MR. TROTTER:  -- that ultimately gave rise to the

21  suspension.  They were concerned about his behavior, that the

22  behavior continued in the form of alleged emails to members of

23  the NYPD that were of a harassing nature.  That's what led --

24  you know, that behavior led to a suspension and then

25  ultimately because of [indiscernible] to obtaining a search

6

1  warrant this execution [indiscernible] additional firearms and

2  [indiscernible].

3            So it's a part of a larger factual arc that the

4  behavior that underlines the search warrant if you look at

5  things in isolation they may seem distinct but ultimately it's

6  all one time line that just kept going [indiscernible].

7            And I would also add that currently his weapons are

8  suspended [ph.] under the applicable rules.  And revocation

9  hearing is not going to be held for criminal prosecution until

10  it is resolved.  So the suspension doesn't represent the final

11  determination that's tied to the criminal prosecution or

12  ultimately will be out there [indiscernible] as a result of

13  that prosecution.

14            MR. PRICE:  And I would just add, Your Honor, that

15  the statement that the suspension was based upon this

16  underlying conduct, there's nothing that we've seen that

17  suggests that we have this -- I have the suspension notice and

18  the letter, the cease-and-desist letter that was sent to

19  him -- to Mr. Nolan and it clearly references the

20  communications to Officer Spinella and Officer Reznick as the

21  basis.

22            [Indiscernible] and the dates, the suspension notice

23  is the date of the 14th and the cease-and-desist is on the

24  13th, but the cease-and-desist was actually handed to

25  Mr. Nolan by the License Division officers when they were

7

1  suspending and seizing his weapons.  He has video of that

2  recorded, the interaction in his home.

3                    [Pause in the proceedings.]

4           THE COURT:  "Failure to notify the License Division

5  of numerous incidents which came to the attention of law

6  enforcement."  What does that mean?

7           MR. PRICE:  Well, that's part of the claim that the

8  law itself is a constitutionally -- or unconstitutionally

9  vague.  Incidents within the License Division regulations

10 there are a number of specified incidents that can lead to a

11 suspension.  But then 30(d) actually refers to situations

12 which is the only time that that word is actually used

13 anywhere in the statute or in -- sorry, in the rules.  So it's

14 not clear.  They say that it was an incident, but 30(d)

15 doesn't apply to incidents.  It applies to situations which

16 could be literally anything since there's no use or definition

17 anywhere else in the statute.

18          THE COURT:  Do you -- what are the numerous

19 incidents that you failed to notice by the License Division

20 about?

21          MR. TROTTER:  So under the applicable rules anytime

22 you're involved in an incident or -- I understand the

23 vagueness of --

24          THE COURT:  Um-hum.

25          MR. TROTTER:  -- specifically that as a factual

8

1  matter, anytime you're involved in an incident sufficient that

2  comes to the attention of the NYPD you are obligated to report

3  that situation to officers.  So if you're -- as you can glean

4  from the complaint there was a long history of alleged

5  harassment by individual complaints in his neighborhood and

6  all of those incidents came to the attention of the 121st

7  Precinct whether because individual Rodriguez contacted the

8  police [indiscernible] himself by reports of aggravated

9  harassment.  So those would be the specific incidents that

10  were referred to in plaintiff's [indiscernible] that was

11  ever -- the License Division was never made aware of

12  complaints involved in all the criminal complaints that were

13  coming into the [indiscernible] involved in -- with the police

14  because of his ongoing feud with [indiscernible] Mr. Rodriguez

15  as identified in the complaint.

16          There were in excess of 15 reports filed with the

17  undercover police officer [ph.].

18          THE COURT:  And is that what the emails or

19  communications were about?

20          MR. TROTTER:  Yeah, that were -- plaintiff's counsel

21  was referring to in terms of [indiscernible].  Is that --

22          THE COURT:  What's in the cease-and-desist demand.

23          MR. TROTTER:  Oh, I -- the cease-and-desist was the

24  121st Precinct NYPD officers in the claims of Mr. Rodriguez's

25  aggregate [indiscernible] persistent that it would appear that

9

1  plaintiff's behavior and reportedly [indiscernible] officers

2  was [indiscernible] of harassment in and of itself.  So there

3  was a cease-and-desist issue so he essentially stopped

4  commenting so [indiscernible] stop.  And that's what gave rise

5  to the seizure of electronics from his home because there was

6  obviously [indiscernible] email that was it was time to

7  [inaudible].

8           THE COURT:  Okay.  So he was making complaints and

9  then essentially harassing -- as you allege are harassing

10 the --

11          MR. TROTTER:  Yes.

12          THE COURT:  -- officers to follow up on the

13 complaint, something along those lines?

14          MR. TROTTER:  That is the allegation.  Obviously

15 [indiscernible] accepted.

16          THE COURT:  Okay.  And what is the IAB investigation

17 into?

18          MR. TROTTER:  So the IAB investigation and

19 ultimately the plaintiff concedes that multiple reports were

20 filed with IAB.  So plaintiff is responsible for the

21 initiation of this IAB investigation that's ongoing because

22 the allegation -- the complaint was that, you know, there was

23 essentially dereliction of duty by officers at the 121st

24 Precinct and then plaintiff continued to take it up the chain

25 to different divisions.

10

1          So plaintiff would file complaints with IAB alleging

2     that officers were -- you know, ignored the various complaints

3     he was making about this individual and, you know, whether

4     investigating them as required.  So because of those

5     complaints to IAB, IAB is looking to quote the officers that

6     were on the suspension.  There was significant cross-over

7     because the officers plaintiff was making complaints to were

8     the ones that ultimately were the License Division to concerns

9     about plaintiff's fitness to carry a handgun license.  So

10    that's essentially how it happened when it came about.

11              THE COURT:  And are those the same officers involved

12    in the later search or are those a different set of officers?

13              MR. TROTTER:  The officers -- I don't know who

14    exactly was involved in the later search because I'm limited

15    in terms of what I can access it, who I can speak to

16    [indiscernible].

17          My concern in requesting the stay is that we

18    can't -- for purposes of the IAB investigation we can't

19    represent them under [indiscernible] until disposition is

20    rendered in the IAB investigation.  I can't speak to them

21    [indiscernible] and that's a concern because these five

22    officers and additional officers [indiscernible] subjects of

23    that IAB investigation which means the defendant was cleared

24    of wrongdoing.  Then it became a criminal [indiscernible] to

25    also represent them [indiscernible].

11

```
1              THE COURT:  Okay.

2              MR. TROTTER:  [Inaudible].  That's the primary

3   concern with these ongoing -- both the criminal prosecution

4   and the IAB investigation of the issues that we -- issues that

5   we [indiscernible] which is why I haven't [inaudible].

6              THE COURT:  So all of the officers were involved in

7   the -- all of the named defendants?

8              MR. TROTTER:  Yes, they're all subjects of that

9   investigation.

10             THE COURT:  How long has this investigation been

11  going on?

12             MR. TROTTER:  I don't know how long the

13  investigation has been going on because IAB [indiscernible]

14  until it's closed.  I do know that there were multiple IAB

15  investigations initiated because of the complaints by

16  plaintiff.  Some of them are closed.  There is -- you know,

17  there is an ongoing active investigation.  The best I can do

18  to relate concerns about, you know, when it finishes as I

19  offered in my application to, you know, [indiscernible] status

20  of IAB investigation [inaudible].

21                  [Pause in the proceedings.]

22             MR. PRICE:  Your Honor, if I may add.

23             THE COURT:  Um-hum.

24             MR. PRICE:  In terms of the number of complaints I

25  would say that within the emails that we have it's clear that
```

12

1  he was constantly being told by members of the NYPD if this

2  keeps happening keep filing complaints.  So there's a reason

3  that he was filing complaints.  He was told to do that, to

4  call 9-1-1.

5         He started -- Mr. Nolan started filing complaints

6  with IAB once it became clear that the 121st Precinct for

7  whatever reason was not processing things.  As a former NYPD

8  detective for 20 years and IAB undercover officer he knew what

9  was going on and they weren't processing anything.  So he

10  tried to take it to IAB and when he saw that they weren't

11  doing what they should be doing, he went to the head of IAB.

12         And clearly in the cease-and-desist letter they

13  aren't saying that there's an issue with his mental

14  instability.  If that was the case, they could have taken

15  other action and 530(d) wouldn't be the method.

16         It's just clear from the letter that they were

17  reacting to the emails, specifically to Spinella and Reznick.

18  And the idea now that they were concerned with his mental

19  stability or that that was the basis, one, just isn't

20  consistent with the written documents and, you know, it

21  doesn't provide an explanation for what they did.

22                    [Pause in the proceedings.]

23         THE COURT:  Well, I mean, I understand your concerns

24  about the propriety of an IAB investigation that is

25  essentially investigating itself.  Notwithstanding that, there

13

1   are a number of named defendants who are currently being

2   investigated in connection with at least some of the

3   allegations in the complaint and that creates a lot of

4   logistical problems.  You know, representation is obviously a

5   big one, but even if they did get their own lawyers it could

6   lead to a lot of other issues, too.

7           At the same time, you know, the pending criminal

8   case could lead to some problems for your client.  You know,

9   just an example.  I mean, if he's deposed in the civil case

10  it's going to be really hard to keep that from, you know,

11  either resulting in him claiming the Fifth Amendment or, you

12  know, resulting in potentially negative consequences to his

13  criminal case assuming it, you know, continues on.  And as you

14  pointed out, you're not representing him in the criminal case

15  so you might necessarily be able to prevent that.  I guess you

16  don't necessarily know.

17          I don't know how closely you're following it or

18  whatever, but you might not necessarily know exactly what

19  defenses are being raised in that case or how they plan to

20  prepare to defend that case.  And it's always possible that

21  something in the discovery here could be used against him in

22  that criminal case, which is part of the reason why courts

23  typically stay civil cases when there's an overlapping

24  parallel criminal case.  And I recognize that it's not a

25  direct parallel because it's not the exact -- it's not like

14

1 the -- the simple situation is when there's one incident and

2 that generates both the civil case and a criminal case.

3 That's clearly not this.

4          Clearly here there's a pattern of contact that

5 extended over a period of time and only some of that conduct

6 overlaps with the criminal case, but I think enough of it

7 overlaps that it's going to create problems.

8          MR. PRICE:  Your Honor, if I may, obviously we've --

9 I've been in touch with his criminal defense attorney and

10 Mr. Nolan.  We're certainly aware of those issues and his

11 criminal defense attorney would, you know, take part in or got

12 us as need be.  Again, we don't -- we believe the issues here

13 are actually relatively narrow.  The motivation behind the

14 letter and if, in fact, the letter was the basis for the

15 termination or the suspension of his license there's really

16 nothing else beyond that that establishes the issue.

17          Additionally, there's the parallel issue of just the

18 constitutionality of the statute which requires no input from

19 any of the defendants and -- you know, so that's something

20 that could at least be addressed in the near term.

21          THE COURT:  Well, that's true.

22          MR. PRICE:  The other --

23          THE COURT:  It's purely a question of law.  So

24 theoretically you don't need any discovery to address that.

25          MR. PRICE:  Exactly, Your Honor.  I would just say

15

1   also that the cases that deal with parallel proceedings are

2   primarily where defendants -- criminal defendants want to stop

3   a civil action to protect themselves.  Here the defendant

4   fully aware of the Fifth Amendment implications is not

5   exercising that right.  He prefers to go forward with a civil

6   action to uphold his constitutional rights.

7           THE COURT:  I understand.  That is typically the

8   posture, but not always.  You know, if it was perhaps just the

9   criminal -- the pending criminal case and the plaintiff wanted

10  to proceed notwithstanding the potential problems it might

11  create for him in the criminal case, I might be inclined to

12  allow the case to go forward.  But I think the outstanding

13  criminal case coupled with the outstanding IAB investigation

14  is going to make moving forward in this case virtually

15  impossible, even without a stay.

16          So what I'm going to do is issue a temporary stay on

17  discovery in this case.  And I'm going to direct defense

18  counsel to provide the Court with an update on both the

19  pending criminal case and the IAB investigation in 60 days

20  because if one -- or obviously if both of those are resolved

21  then there's no issue, but if even one of those is resolved it

22  might be enough to move forward in the case.

23                [Pause in the proceedings.]

24          MR. PRICE:  Your Honor, regarding the challenge to

25  the facial constitutionality of the statute is that something

16

1  that can proceed or at least after the six -- the initial 60

2  days we could proceed if --

3          THE COURT:  Let's wait the 60 days because if we

4  could do it all at one time that'd be better.  If it looks

5  like things are going to drag out longer and you want to

6  proceed with just the legal challenge, that might be something

7  that could at least advance part of the case.  Since -- I

8  don't even -- defendants aren't saying that that needs any

9  discovery, right?

10          MR. TROTTER:  No.  I mean --

11          THE COURT:  Yeah.

12          MR. TROTTER:  -- [inaudible].  And, Your Honor, I

13  would just ask, we have not yet entered [indiscernible] for

14  any of the defendants.

15          THE COURT:  Um-hum.

16          MR. TROTTER:  So I would also add [indiscernible] --

17          THE COURT:  Well, everything is stayed, so --

18          MR. TROTTER:  Okay.  So there are [indiscernible] as

19  well.

20          THE COURT:  Um-hum.

21          MR. TROTTER:  Okay.

22          THE COURT:  Can't answer if you don't know whether

23  you represent them or not.

24          MR. TROTTER:  No, I earlier I -- you had set

25  discovery so [inaudible], so thank you.

17

1           THE COURT:  All right.  So status report by May 8th.

2   And we'll see where we are at that point.  Obviously if things

3   are resolved sooner than that let me know -- or let everyone

4   know as soon as things are resolved one way or the other.

5           Anything else?

6           MR. TROTTER:  No, Your Honor.

7           MR. PRICE:  No, Your Honor.

8           THE COURT:  Okay.  All right.  Thank you.  I look

9   forward to hearing from you in a few days.

10  (End of proceedings at 2:30 p.m.)

11                        *  *  *  *  *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

18

1          I certify that the foregoing is a court transcript

2    from an electronic sound recording of the proceedings in the

3    above-entitled matter.

4

5

6    _____

7                    Ruth Ann Hager, C.E.T.**D-641

8    Dated:  July 17, 2019

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25