UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
WILLIAM R. NOLAN,

         Plaintiff,

     -against-

THE CITY OF NEW YORK, and
JOSEPH REZNICK, and
RAYMOND SPINELLA, and
MICHAEL BARRETO, and
ASIF IQBAL, and POLICE DETECTIVE JAMES
BUTLER, and POLICE OFFICER BRYAN
BURGESS, and POLICE OFFICER JOHN DOE, all
in their individual and official capacities, and JOSE
RODRIGUEZ, individually,

         Defendants.
--------------------------------------------------------------X

**SECOND AMENDED COMPLAINT**

**Docket No: 19-cv-00187-RPK-ST**

**JURY TRIAL DEMANDED**

   WILLIAM R. NOLAN ("Plaintiff"), by and through his attorneys, BORRELLI &
ASSOCIATES, P.L.L.C., as and for his Second Amended Complaint against THE CITY OF NEW
YORK ("City"), and JOSEPH REZNICK, and RAYMOND SPINELLA, and MICHAEL
BARRETO, and ASIF IQBAL, and POLICE DETECTIVE JAMES BUTLER, and POLICE
OFFICER BRYAN BURGESS, and POLICE OFFICER JOHN DOE, all their individual and
official capacities, (all, together where appropriate, as "City Defendants"), and JOSE
RODRIGUEZ, individually, (together with City Defendants, where appropriate, as "Defendants"),
alleges upon knowledge as to himself and his own actions and upon information and belief as to
all other matters as follows:

## NATURE OF THE CASE

1.  This is a civil action for damages, a writ of mandamus, equitable relief in the form of an
injunction, and a declaratory judgment, based upon Defendants' collective violations of Plaintiff's

rights guaranteed to him by: (i) the Freedom of Speech and Right to Petition provisions of the First Amendment of the United States Constitution; (ii) the prohibition against unreasonable seizures provision of the Fourth Amendment of the United States Constitution, and (iii) the Second Amendment of the United States Constitution; (iv) the Fourth, Fifth, and Sixth Amendments of the United States Constitution, in relation to Plaintiff's malicious prosecution claim; (v) the Fifth and Sixth Amendments of the United States Constitution, in relation to Plaintiff's denial of right to fair trial claim; (vi) the First, Second, and Fourth Amendments of the United States Constitution, in relation to Plaintiff's civil conspiracy claim; (vii) the Fourth, Fifth, Sixth, and Eighth Amendments of the United States Constitution, in relation to Plaintiff's failure to intervene claim, each made applicable to the City Defendants vis-à-vis the Due Process Clause of the Fourteenth Amendment of the United States Constitution, and all to be enforced vis-à-vis 42 U.S.C. § 1983, and each of which City Defendants acted in conspired with Defendant Rodriguez to violate; (ix) New York common law, in relation to Plaintiff's claims of abuse of process, conversion, and negligent hiring, training, and retention; and (x) any other claim(s) that can be inferred from the facts set forth herein.

2.      Plaintiff is a retired, decorated New York Police Department ("NYPD") Detective who dedicated much of his career to routing out corruption in the NYPD.  In February 1986, while he was still in the NYPD Academy, Plaintiff was recruited to work as an undercover operative for what was then named the Internal Affairs Division ("IAD").  Plaintiff started as an undercover IAD officer later that year.  In 1989, Plaintiff was placed in "deep undercover" and his personnel folder and records were altered to indicate that he had been terminated by the NYPD.  He was given a new identity and changed his physical appearance by growing long hair and facial hair, piercing his ears, and tattooing his body.  As a deep undercover officer, Plaintiff worked on several

2

investigations involving drug trafficking and illegal firearms sales by active duty, retired, and former NYPD officers.  Plaintiff's dedication to routing out corruption in the NYPD resulted in several high-profile arrests and convictions, which in turn resulted in a contract being put on his head.  Indeed, Plaintiff's decorated service as an undercover officer has earned him the indelible label of "Rat," and regrettably made him a target for revenge by unscrupulous individuals, including current, former, and retired members of the NYPD.

3.      Plaintiff has also been harassed and threatened for, at this point, over five years, by Jose Rodriguez, an individual who has ties to the 121st Precinct of the NYPD, located at 970 Richmond Avenue, Staten Island, New York, and who has told Plaintiff that 121st Precinct officers refer to Plaintiff as an "IAB Rat."  To that latter point, from approximately 1995 to 2002, Plaintiff and Matthew Harrington, the Commanding Officer of the 121st Precinct, worked in the same building at 1 Edgewater Plaza on Staten Island.  Harrington, along with many other officers, routinely refused to speak to Plaintiff during those years because of his background in IAD.

4.      To protect himself and his wife from multiple threats, Plaintiff has chosen to exercise his Second Amendment right to keep and bear arms for self-protection by maintaining a New York City handgun license and five handguns.

5.      Starting on November 27, 2017, Plaintiff exercised his First Amendment right to free speech, and to petition the government to redress grievances, by: (a) filing multiple reports with the NYPD Internal Affairs Bureau ("IAB" – formerly known as IAD) complaining about, and seeking to redress, the intentional failures of the 121st Precinct to investigate complaints that Plaintiff had properly made against Rodriguez for aggravated harassment; (b) submitting a complaint to James O'Neil, the NYPD Police Commissioner, reporting and seeking to redress the 121st Precinct's failure to investigate Plaintiff's complaints and IAB's failure to respond to his

3

request for assistance; (c) reporting to senior NYPD officials, including Defendant Reznick, the Deputy Commissioner of IAB, and Defendant Spinella, the Chief of Staff of the NYPD Commissioner's Office, to seek redress for IAB's intentional failure to properly investigate the 121st Precinct's reprehensible conduct; (d) reporting to senior NYPD officials, including Reznick and Spinella, to seek redress for the 121st Precinct and IAB intentionally losing or destroying (colloquially referred to in the NYPD as "shit-canning") complaints and evidence that Plaintiff had submitted regarding Rodriguez and the 121st Precinct; (e) openly questioning Reznick's and Spinella's lack of control over their subordinates; (f) submitting a Freedom of Information Law ("FOIL") request for information related to his complaints against Rodriguez and for IAB reports regarding the 121st Precinct; and (g) filing a complaint reporting the unlawful actions of Defendants Reznick and Barreto, the Commanding Officer of the NYPD License Division, as well as non-party License Division officers Detective Daniel Aybar, Sergeant Brian Herbert, and Sergeant Martin Browne, and Inspector Matthew Harrington, to the New York City Department of Investigations ("NYCDOI").

6.      Subsequently, from November 27, 2017 through to the present, while acting under color of law and by way of authority and power granted to them by the City, and in accordance with the customs and usages of the NYPD, Reznick and Spinella, as well as Defendant Iqbal, who was the Executive Officer of the NYPD License Division, and Barreto, all of whom were collectively responsible for the depravation of Plaintiff's rights, as well as their agents, officers, servants and/or employees, engaged in unlawful conduct by blatantly retaliating against Plaintiff for exercising his First Amendment rights to free speech and to petition the government by: (a) willfully or recklessly ignoring, if not actually ordering, the shit-canning of Plaintiff's complaints to the 121st Precinct and IAB; (b) suspending Plaintiff's license to possess handguns without cause, which is also in

violation of Plaintiff's Second Amendment rights; (c) confiscating Plaintiff's license and handguns without cause, which is also in violation of Plaintiff's Second and Fourth Amendment rights; (d) while knowing that Plaintiff was the victim of aggravated harassment and threats from Rodriquez, intentionally leaking to Rodriguez the fact that Plaintiff's handguns had been confiscated; (e) interfering with Plaintiff's rights to have his license reinstated and his handguns returned; (f) threatening Plaintiff with criminal or civil prosecution under circumstances that could not justify either; and (g) denying Plaintiff's FOIL request and interfering with an investigation by the NYCDOI into the allegations that Plaintiff made against Defendants Reznick and Barreto, as well as non-party NYPD officers Aybar, Herbert, Browne, and Harrington.

7.     Moreover, as set forth in more detail below, City Defendants' seizure of Plaintiff's license and handguns was clearly unlawful and therefore in violation of the Fourth Amendment.  First, Defendants Iqbal and Barreto intentionally misstated the language of 38 RCNY § 5-30(d)[1] in the Suspension Notice (the "Notice") issued to Plaintiff in order to justify the suspension and confiscation of Plaintiff's license and handguns.  Second, the License Division did not conduct a review and evaluation prior to issuing the Notice to Plaintiff, as is required by 38 RCNY § 5-30(e). Third, nothing in 38 RCNY authorized the suspension of a license or seizure of firearms for failing to report "situations," as opposed to "incidents."  Fourth, the suspension of Plaintiff's license was ordered by Reznick, in coordination with a frivolous Cease and Desist letter issued by Lawrence Byrne, the former NYPD Deputy Commissioner of Legal Matters, on behalf of Spinella and Reznick, who had no authority under 38 RCNY Chapter 5 to direct such an action.  City Defendants' actions, including misstating the law, not following required procedures, and acting

---

[1] All references herein to the Rules of the City of New York ("RCNY") refer to those rules as in effect in 2018.

on unlawful orders, establish that they clearly knew that the suspension of Plaintiff's license and seizure of his handguns was unlawful and therefore in violation of Plaintiff's Fourth Amendment rights. Nonetheless, City Defendants caused License Division officers Sergeant Browne and Sergeant Rampkin Soon, who were acting under color of law, and by way of authority and power granted to them by the City, and in accordance with the customs and usages of the NYPD, to violate Plaintiff's Fourth Amendment rights by relying upon, and specifically referring to, 38 RCNY § 5-30(d) as the basis for carrying out their orders.

8.     City Defendants' suspension of Plaintiff's license and seizure of his license and handguns under the guise of 38 RCNY § 5-30(d), a rule or regulation promulgated by the City, also violated Plaintiff's rights under the Second Amendment. The Second Amendment's guarantee that "the right of the people to keep and bear arms shall not be infringed" has been held to guarantee the central right of self-defense, particularly in the home, where the need for defense of self, family, and property is most acute. While the guarantees of the Second Amendment are not absolute, a rule or regulation, such as 38 RCNY § 5-30(d), which under the pretense of regulating amounts to a destruction of the right, is unconstitutional. As set forth in more detail below, § 5-30(d) was unconstitutionally vague and overly broad, and allowed the NYPD to suspend a license-holder's license and seize his/her firearms without a reasonable basis, or any basis at all, as was the case with the Plaintiff, which amounted to a destruction of Plaintiff's Second Amendment rights. Moreover, § 5-30(d) did not meet constitutional muster for lack of a historical analogue, as there are no historical regulations that impose a comparably vague and arbitrary burden on an individual's Second Amendment rights. Accordingly, in addition to damages, Plaintiff seeks a declaration that 38 RCNY § 5-30(d) was unconstitutional, either facially or as applied.

9.      Plaintiff also seeks a writ of mandamus ordering City Defendants, specifically Defendant Barreto, to reinstate Plaintiff's license and return Plaintiff's license and handguns.  A writ of mandamus in this case, assuming the Court finds 38 RCNY § 5-30(d) to have been unconstitutionally vague or overly broad, or in violation of the Second Amendment, would not be an exercise of supplemental jurisdiction over state law matters related merely to due process violations, but instead a necessary and direct exercise of the Court's authority under 28 U.S.C. §1651(a) and its inherent authority to grant full and complete relief for violations of substantive Constitutional rights.

10.     Further, as set forth in more detail below, leading up to, and during, the December 20, 2018, execution of a search warrant of Plaintiff's residence, City Defendants committed additional violations of Plaintiff's constitutional rights and the law, for which they are liable.  Specifically, Defendant Butler intentionally provided false information to the Richmond County District Attorneys' Office to obtain the search warrant, with the intent of harassing and causing undue harm to Plaintiff.  Upon executing the search warrant, the NYPD officers including, but not limited to, Butler, Burgess, and Doe, unlawfully entered Plaintiff's residence, seized Plaintiff's property without cause, including, but not limited to, Plaintiff's Mossberg Model 590 Shockwave shotguns, and twelve-gauge ammunition, and forcibly arrested Plaintiff.  Subsequently, City Defendants, including but not limited to Butler, maliciously prosecuted Plaintiff without probable cause to believe that he had committed any violation of the law, much less that crimes that they charged him with, specifically the felonies of Criminal Possession of a Weapon in the Second Degree, Penal Law ("PL") 265.03, four counts of Criminal Possession of a Weapon in the Third Degree, PL 265.02, two counts of Criminal Possession of a Firearm, PL 265.1B, and the misdemeanors of

two counts of Criminal Possession of a Weapon in the Fourth Degree, PL 265.01, Obstructing Governmental Administration, PL 195.05, and Resisting Arrest, PL 205.30.

11.     While the charges in connection with Plaintiff's December 20, 2018, arrest were pending, in a continued effort to harass Plaintiff, on or about January 14, 2020, in the vicinity of the NYPD 120 Precinct, City Defendants, including but not limited to Defendant Butler, arrested and maliciously prosecuted Plaintiff again, levying over forty charges against him for crimes that City Defendants knew Plaintiff did not commit, all while acting with something other than a desire to see the ends of justice served.

12.     As explained in greater detail below, throughout the prosecution of the charges against Plaintiff in connection with his December 20, 2018, and January 14, 2020, arrests, City Defendants, including but not limited to Defendant Butler, conspired with Defendant Reznick and individuals within the NYPD License Division, and separately with Defendant Rodriguez, in fabricating evidence and making false statements in furtherance of Plaintiff's prosecution with the intent of harassing Plaintiff.  Beginning with Plaintiff's December 20, 2018 arrest, and throughout his subsequent arrest, and both prosecutions, Defendants Butler, Burgess, and Doe, failed to intervene on Plaintiff's behalf, despite knowing that his constitutional rights were being violated. During Plaintiff's prosecution that lasted over three years, he was caused to suffer damages, including, but not limited to, economic damages, humiliation, pain and suffering, and personal and professional embarrassment, all as a result of the Defendants' egregious unconstitutional and tortious conduct.

13.     Plaintiff's prosecutions in connection with his December 20, 2018, and January 14, 2020, arrests, were joined and transferred to Richmond County Supreme Court, Criminal Term, on March 3, 2020, under the modified title "C docket 00225C-2020," although it continued to have

the tracking number associated with Plaintiff's initial indictment, "623/2018." Thereafter, Plaintiff's prosecution for the cumulative false and fabricated charges lasted for, approximately, an additional two years and seven months in total, with the three felony charges and the misdemeanor charge for two counts of Criminal Possession of a Weapon in the Fourth Degree, all stemming from Plaintiff's December 20, 2018 arrest being dismissed on January 8, 2021, and the remainder of all the charges against Plaintiff being dismissed on July 13, 2022. Thus, the criminal case terminated in Plaintiff's favor.

14.     After the dismissal of the charges, in a continued effort to harass Plaintiff, City Defendants have refused to return property that they unlawfully seized from Plaintiff, including, but not limited to, his handguns, two Mossberg Model 590 Shockwave shotguns, cartridges, and his twelve-gauge shotshell ammunition, despite their obligation to return Plaintiff's property.

15.     Throughout the events described herein, Defendant Rodriguez has constantly harassed Plaintiff with the tacit approval of the City and/or the NYPD, who failed to respond to Plaintiff's numerous complaints in an effort to harass Plaintiff in violation of his rights. As described in more detail below, on numerous occasions, Rodriguez has followed Plaintiff in his vehicle, waited outside Plaintiff's home in his vehicle, made threats to Plaintiff's physical safety online, and importuned others to assault Plaintiff. Despite Plaintiff contacting the NYPD about these incidents, the NYPD continued its above-described behavior of willfully or recklessly ignoring, if not actually ordering, the shit-canning of Plaintiff's complaints to the 121st Precinct.

16.     Throughout the events described herein, the City knew, or reasonably should have known, that Defendants Reznick, Spinella, Barreto, Iqbal, Butler, Burgess, and Doe had infringed the rights of, maliciously prosecuted, and otherwise abused their authority against individuals while

in the course and scope of their employment with the City and the NYPD, and were unfit to act as police officers.

17.     As a result of Defendants' violations of Plaintiff's constitutional rights, New York common law, and their egregious tortious conduct, Defendants caused Plaintiff to suffer damages, including, but not limited to, economic damages, loss of self-esteem, self-confidence, personal dignity, harm to their personal and professional reputations, stress and anxiety, and emotional pain and suffering.

## CONDITIONS PRECEDENT

18.     Plaintiff served a "Notice of Claim" on the City, dated October 7, 2022, which was within ninety days of the accrual of Plaintiff's state law claims alleged herein.

19.     More than thirty days have elapsed since Plaintiff served the aforementioned "Notice of Claim" on the City, and the City has neglected and/or refused to make adjustment or payment thereon.

20.     This action, for the state law claims alleged herein, was commenced by Plaintiff's filing of the Amended Complaint on April 27, 2023, which was within one year and ninety days after the causes of action herein accrued.

## JURISDICTION AND VENUE

21.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343(a), 1651(a), and 2201, as well as 42 U.S.C. § 1983.

22.     Venue is appropriate in this court pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claims for relief occurred in this judicial district.

## PARTIES AND RELEVANT AGENCIES AND DIVISIONS

23.     At all relevant times herein, Plaintiff was and is a resident of Staten Island, New York, and was and is a citizen of the United States.

24.     At all relevant times herein, Defendant City was and is a municipal corporation duly organized and existing under the laws of the State of New York, which oversees the NYPD and its various components, including the 121st Precinct, IAB, the License Division, the NYPD Police Commissioner's Office, and the NYCDOI.

25.     At all relevant times herein, the NYPD was and is a municipal police department with approximately 36,000 officers, spread across seventy-seven patrol precincts, policing the five boroughs of the City of New York.

26.     At all relevant times herein, the NYCDOI was and is the City's Inspector General with independent oversight of City government, including authority to investigate any agency, officer, elected official or employee of the City.

27.     At all relevant times herein, the IAB was and is an organization with the stated mission of being "dedicated to preserving integrity, which is critical to the function of the Police Department, and fighting corruption within the NYPD . . . IAB helps to ensure [public] trust by detecting, investigating, and bringing to justice the small number of New York City police officers and civilians who engage in misconduct and corruption." *See* https://www1.nyc.gov/site/nypd/bureaus/investigative/internal-affairs.page (last visited December 20, 2018).

28.     At all relevant times herein, the NYPD License Division had and has responsibility for administering the firearms licensing rules and regulations of the City, including approving the issuance, suspension, and/or revocation of licenses and confiscation of firearms.

29.     At all relevant times herein, the 121st Precinct served and serves the northwestern shore of Staten Island, including Willowbrook, Westerleigh, Port Richmond, Mariner's Harbor, Elm Park, Port Ivory, Chelsea, and Bloomfield.

30.     At all relevant times herein, the NYPD Commissioner's Office was and is headed by James P. O'Neill, Police Commissioner of the City of New York.

31.     At all relevant times herein, Defendant Joseph Reznick was the Deputy Commissioner of the IAB.

32.     At all relevant times herein, Defendant Raymond Spinella was and is the Chief of Staff of the NYPD Commissioner's Office.

33.     At all relevant times herein, Defendant Michael Barreto was and is the Commanding Officer of the NYPD License Division.

34.     At all relevant times herein, Defendant Asif Iqbal was the Executive Officer of the NYPD License Division.

35.     At all relevant times herein, Defendants Butler, Burgess, and Doe were and are duly sworn police officers employed by the NYPD, and who were acting under the supervision of the NYPD, within the scope of their employment, under color of law, and Plaintiffs sue them in their individual and official capacities.

36.     At all relevant times herein, Defendant Rodriguez was and is a resident of Staten Island, New York.

**BACKGROUND FACTS**

37.     Plaintiff is a retired, twenty-year veteran of the NYPD, whose service to the NYPD is detailed in the paragraphs above.

38.     Since retiring from the NYPD, Plaintiff has at times earned supplemental income through employment as an armed security guard and as a firearms expert training other security guards. Plaintiff's work in these areas requires that he possess and maintain a valid license to possess and carry firearms, which Plaintiff had done from the time of his retirement through and until his license was suspended and his license and five handguns were confiscated on March 14, 2018.

39.     At all relevant times herein, firearm licensing and ownership in the City of New York was regulated in accordance with then-Title 38 of the Rules of the City of New York, as codified in 2018 ("38 RCNY") Chapters 1 to 5.  Handgun licenses were covered by 38 RCNY Chapter 5, the relevant parts of which, §§ 5-30(d), (e), and (h) provided that:

> (d)  In addition to the aforementioned "Incidents," whenever the holder of a license becomes **involved in a situation** which **comes to the attention of any police department, or other law enforcement agency**, the licensee shall immediately notify the License Division's Incident Section of the details. (Bold font added);

> (e)  All "Incidents" shall be reviewed and evaluated by License Division investigators.  If, as a result of the "Incident" the License Division finds it necessary to suspend or revoke the license, the licensee shall receive notification by mail.  Said notification shall advise the licensee of the status of her/his license and the reason for the suspension/revocation;

> (h)  If her/his license is suspended or revoked, the licensee shall be issued a written Notice of Determination Letter, which shall state in brief the grounds for the suspension or revocation of the license and notify the licensee of the opportunity for a hearing. The suspended/former licensee has the right to submit a written request for a hearing to appeal the decision. This request shall be made within thirty (30) calendar days of the date of the Notice of Determination Letter.

40.     While the term "Incidents" was and is defined in several contexts within 38 RCNY Chapter 5, all of which generally involve instances where the licensee has committed a crime and/or has somehow compromised the safety of a firearm or license, it did not define "situations," which was

13

the subject of § 5-30(d).  Additionally, this section did not define what it means to "come to the attention of" police or law enforcement.  In fact, the references to "situations" and "come to the attention of" in § 5-30(d) were the only use of those terms anywhere in 38 RCNY Chapters 1–5. Moreover, the City failed to consider whether there was any historical analogue that could serve as a constitutional basis for the plain text of this regulation, which is unduly vague, and as explained below, was used to unilaterally violate Plaintiff's Second Amendment rights.  Indeed, irrespective of the City's consideration of the issue, there is no historical analogue.

**<u>Plaintiff's Protected Activities</u>**

41.    On or about October 12, 2016, Rodriguez, a tow truck operator, began harassing Plaintiff after Plaintiff sued an auto-repair shop, located at 4282 Victory Blvd, Staten Island, New York, and its owner, Salvatore Sportiello, with whom Rodriguez was friends and for whom he performed tow services, over an injury to Plaintiff that occurred at the shop.  Rodriguez's actions started with harassing phone calls and then quickly progressed to threatening and harassing emails.  Eventually, Rodriguez began driving his tow-truck by Plaintiff's apartment while shouting harassing and threatening statements at Plaintiff and blaring loud music.  Rodriguez would also drive up as Plaintiff attempted to enter or exit his vehicle, and park next to Plaintiff's car to prevent him from being able to get into his vehicle or to trap him inside.  Rodriguez's campaign of harassment has gone on for more than two years and continues unabated to this day.

42.    Accordingly, on or about October 20, 2016, Plaintiff filed his first complaint (complaint number 2016-121-006787) against Rodriguez with the 121st Precinct, which has jurisdiction over enforcement of the law and investigation of crimes within its geographical bounds (as described above), stating that he was the subject of aggravated harassment by Rodriguez and detailing the harassing phone calls and emails.  Along with his complaint, Plaintiff provided evidence of

threatening and harassing emails that Rodriguez had sent to Plaintiff, including ones where Rodriguez threatened to make false complaints against Plaintiff by alleging that Plaintiff had pointed a gun at Rodriguez's son if Plaintiff ever returned to the repair shop.

43.   Sometime later, in late-2016 or early-2017, Rodriguez told Plaintiff that he had learned that Plaintiff had filed a complaint against him.  Rodriguez laughed and told Plaintiff "good luck with that, I have close ties to the 121st Precinct," or words to that effect.  Rodriguez also told Plaintiff in emails that he should stop waiving to cops on the street because everyone in the 121st Precinct knew him to be an "IAB rat."

44.   On January 18, 2017, Plaintiff sent an email to Robert Reardon, an Investigator with the Richmond County District Attorneys' Office, Clyde Fernandes, a Detective in the NYPD IAB, James Butler, a Detective with the 121st Precinct, and a generic United States Department of Justice Internal Affairs email address, regarding his complaints filed with the 121st Precinct against Rodriguez, and the failure of the 121st Precinct to arrest and charge Rodriguez.  Plaintiff's email was forwarded to Sportiello, who then forwarded the email to Rodriguez, but only after first deleting the email(s), which would have identified who had forwarded it to Sportiello.  Rodriguez then forwarded the chain back to Plaintiff, apparently to prove that he had connections in the 121st Precinct, adding that, "everyone knows your (sic) lying EDP ["emotionally disturbed person"] especially the 121pct."

45.   The 121st Precinct ignored Plaintiff's initial complaint.  Undeterred, Plaintiff continued to file complaints with the 121st Precinct against Rodriguez as the harassment continued, but those complaints were also ignored or shit-canned, as Rodriguez had predicted.  After filing at least six complaints with the 121st Precinct, and at least six reports to IAB, all between October 2016 and November 2017 without ever being contacted by an investigating detective, and after multiple

unsuccessful attempts to speak with the Commanding Officer of the 121st Precinct, Harrington - - who as described above, mostly refused to speak with Plaintiff while they worked together in the same precinct for many years - - about his ignored complaints, Plaintiff decided to take his complaints further up the NYPD chain of command.

46.     Accordingly, on November 27, 2017, Plaintiff filed another complaint with IAB.  In it, Plaintiff again described the harassment and stalking that he had been subjected to, the multiple complaints that he had filed with the 121st Precinct, and the utter failure of the 121st Precinct to investigate those complaints or even bother to contact him for additional information.  Later that day, having again received no response from IAB, Plaintiff sent a follow-up email to IAB requesting an IAB log number and asking for an explanation for why no one from IAB had contacted him yet.  Plaintiff copied Reznick on the follow-up email in the hope that Reznick, as the Commanding Officer of IAB, would take an interest and help to quickly put a stop to the 121st Precinct's shit-canning of his complaints.

47.     At 2:47 a.m. on November 28, 2017, Reznick responded to Plaintiff stating that he would "have someone from my office contact you tomorrow."

48.     On November 28, 2017, at approximately 6:00 p.m., Plaintiff was interviewed by Sgt. Anthony Castellana of IAB Group 33 at the Police Bureau Staten Island Inspections and Investigations Office, One Edgewater Plaza, 5th Floor, Staten Island, New York.  Plaintiff provided Castellana with all of the information that he had regarding the harassment committed by Rodriguez, the complaints that he had filed with the 121st Precinct, and the failure of the 121st Precinct to do any investigation.

49.     On November 29, 2017, at 6:52 a.m., Plaintiff emailed Reznick to thank him for arranging the interview with Castellana.  Plaintiff also informed Reznick of the fact that he had recently

reported Rodriguez to the NYPD Police Impersonation Unit ("Group 51"), and the U.S. Marshal

Service ("USMS")'s Internal Affairs Unit for identifying himself to Plaintiff as a U.S. Marshall

and presenting fake badges that looked like a U.S. Marshal shield and an NYPD Detective shield.

50.     Reznick responded to Plaintiff at 2:13 p.m. that day telling him, "I will check up on your

call to Group 51.  I don't like people who impersonate law enforcement.  They tarnish our name.

Good luck with your complaints being handled by the Squad."

51.     Notwithstanding Plaintiff's meeting with Castellana, or Reznick's ostensible interest in

assisting Plaintiff, nothing was done to stop Rodriguez, who continued to harass Plaintiff verbally

by shouting offensive statements or blaring music outside Plaintiff's apartment, as well as through

emails.  Plaintiff continued to call 9-1-1 and to file complaints with the 121st Precinct regarding

Rodriguez's conduct, but nothing was done to investigate or stop the harassment.  Frustrated with

the lack of any apparent progress, on or about January 11, 2018, Plaintiff contacted Castellana to

ask about the status of the investigation into his complaints.  Castellana responded, without any

further explanation, that it was "out of [his] hands."

52.     On January 18, 2018, unable to obtain any information on the status of his complaints to

the 121st Precinct or IAB, and still being subjected to threats and harassment, Plaintiff once again

emailed Reznick, writing, "Chief Reznick, I apologize for having to contact you again regarding

this matter, but it appears that whatever is being done by units under your command, is not

curtailing U.S. Marshal impersonator, Jose Rodriguez from continuing to threaten, stalk and harass

me."  Plaintiff also informed Reznick of additional complaints that he had made to the 121st

Precinct that went nowhere, and of Sergeant Castellana's comment about things being out of his

hands.  Plaintiff further wrote to Reznick: "With all due respect, Chief, the people who work for

you are either lying to you about what is going on, or they are playing the 'shell game' . . . [a]gain,

17

sorry to bother you with this, but I have attempted to use the proper chain of command with no success.  I am still in fear [for] my wife's and my safety.  Please advise on how to proceed. Respectfully, William Nolan Detective NYPD (retired)."

53.     A few hours later, at 7:14 p.m. on January 18, 2018, Plaintiff emailed Reznick again, this time copying Spinella, with whom Plaintiff was acquainted from his time working in the 120th Precinct back in 1987 and whom he hoped would exercise some authority over IAB and the 121st Precinct, and others, informing Reznick that Rodriguez had sent him two harassing emails that day, and that when he called to make a complaint, the responding officers from the 121st Precinct refused to take his report.  Reznick responded forty minutes later stating: "Billy, I have forwarded your last message to both the [Commanding Officer] of your Pct. and the Investigative Commander for SI with instructions to follow up with your issues.  If no one contacts you by next week, email me a message.  Chief R."

54.     On January 19, 2018, Captain Scott Weisberg, the Executive Officer of the Staten Island Detective Bureau, called Plaintiff to arrange a meeting to discuss Plaintiff's complaints.  On January 24, 2018, Plaintiff emailed Reznick, copying Spinella and others, letting Reznick know about the scheduled meeting with Weisberg.  Plaintiff ended his email stating, "I will advise as needed.  Thank you for your help. Respectfully, William R. Nolan, Detective NYPD (retired)."

55.     Reznick replied later that day saying, "Bill.  You need not keep me informed of any future dealings that you have with SI personnel regarding your current issues.  The Capt will seek my advice and/or counseling if needed.  I thank you for your cooperation.  Chief R."  Plaintiff immediately stopped including Reznick on his email correspondence to the NYPD and IAB regarding his then current issues.  Plaintiff also stopped including Spinella on his emails at this time because the issues with his complaints seemed to be getting addressed.

56.     More than a month later, on March 2, 2018, Plaintiff spoke with Weisberg about the status of the investigation into his complaints against the 121st Precinct.  Weisberg told Plaintiff that James Butler, the detective who had conducted the investigation into Plaintiff's complaints, had concluded that there was probable cause to arrest and charge Rodriguez for multiple counts of harassment, aggravated harassment, stalking, and threats against Plaintiff.  Plaintiff was also told that the Richmond County District Attorney's Office had proposed having Plaintiff and Rodriguez engage in mediation in lieu of prosecuting Rodriguez.

57.     Immediately after their conversation ended, Plaintiff summarized the substance of what he had been told, as detailed immediately above, in an email that he sent to Weisberg and Butler, as well as to Reznick, Spinella, and others.  Plaintiff also expressly stated that he wanted to proceed with prosecution, and that he was not interested in mediating issues with Rodriguez.  Plaintiff also repeated that he and his wife continued to live in fear of Rodriguez and his associates and asked that he be notified once an arrest was made.

58.     Neither Weisberg nor Butler, nor anyone else included on the email, responded to Plaintiff to contradict or qualify anything that Plaintiff had stated in his email.

59.     Notwithstanding Plaintiff's express desire to pursue prosecution, still on or about March 2, 2018, Weisberg contacted Rodriguez and instructed him to stop harassing and threatening Plaintiff, and also offered to arrange for mediation between Plaintiff and Rodriguez.

60.     On March 3, 2018, Plaintiff emailed Weisberg to complain about Weisberg's overtures to Rodriguez.  Plaintiff told Weisberg that his actions had "made an already bad situation worse.  As per our last phone conversation, I advised you that it's in the department's best interest to properly do their job and stop the 'shit canning' of complaints and/or playing the 'shell game', especially in this matter."

61.    On March 4, 2018, Plaintiff emailed Weisberg, Reznick, Spinella, and others to complain about the lack of an arrest and about Weisberg's offer of mediation to Rodriguez.  Plaintiff also informed the recipients that Rodriguez had harassed Plaintiff again the prior evening by driving up and down Plaintiff's block several times and then parking outside of Plaintiff's apartment, all the while blasting his stereo so loudly that Plaintiff's windows shook.  Additionally, shortly after that incident, Rodriguez's son and others vandalized Plaintiff's vehicle by throwing sticks, gum, and other debris onto the hood and windshield of the vehicle.  Plaintiff then addressed Reznick and Spinella directly, adding, "I apologize for having to CC you on this again, but as you can see the 'shit canning' is still in effect and those who work under, for and with you, have no interest in doing their jobs properly."

**Defendants' Unlawful Retaliatory Actions**

62.    Plaintiff did not receive an immediate response to his March 4, 2018 email.  Instead, on March 14, 2018, two officers from the NYPD License Division, Sergeants Browne and Soon, showed up at Plaintiff's home, without warning or notice, and acting under the color of law, and in accordance with the customs and usages of the NYPD, presented Plaintiff with the Notice.

63.    The Notice, dated March 14, 2018, was signed by Iqbal, on behalf of Barreto, and stated in relevant part that: "This letter is to advise you that your license is suspended as a result of the following incident: Your failure to notify the License Division of numerous incidents which came to the attention of Law Enforcement, as was required of you pursuant to Title 38 RCNY § 5-30(d)." The Notice further required Plaintiff to "Forward a notarized letter to the License Division . . . explaining the facts and circumstances surrounding your **incident**." (Emphasis in original).  The Notice did not inform Plaintiff of what incident, or incidents, it was referring to, nor did 38 RCNY § 5-30(d), which applied to "situation(s)," provide any assistance.

64.    Having no idea what incident(s) the Notice was referencing, Plaintiff asked Browne and Soon to explain the basis for the suspension.  In response, Browne asked Plaintiff if he had filed complaints with the NYPD.  Plaintiff, stunned, explained to the officers that he was the victim of repeated incidents of aggravated harassment that he had properly reported, and that he could not believe that the law allowed for a suspension of his license under such circumstances.  Plaintiff further explained to Browne and Soon the fact that as a retired undercover officer who had put other cops in jail, he constantly lived in fear of reprisals.  Plaintiff repeatedly emphasized that they were disarming someone who was a crime victim who was in a position of fearing for his life and who needed his handguns to protect himself and his wife.  Browne and Soon merely replied that this was the law.  Plaintiff responded by demanding that the officers have a Duty Captain come to his apartment.  Soon made a call but then stated that the Duty Captain would not be coming.

65.    Plaintiff continued to protest the legality of the Notice, expressly telling the officers that they were acting on unlawful orders given in retaliation for him filing reports with IAB about the 121st Precinct's failure to investigate his complaints, that their actions in following unlawful orders were themselves unlawful, and by questioning the interpretation and validity of the rule being cited as the basis to suspend his license and confiscate his handguns.  His protests were to no avail and ultimately, after being told that he could comply with the suspension and confiscation or face arrest for failing to do so, Plaintiff reluctantly, involuntarily, and under protest, surrendered his license and five handguns.

66.    Immediately after confiscating Plaintiff's license and handguns Officer Soon handed Plaintiff an envelope that contained a letter from Byrne dated the day before, March 13, 2018, directing Plaintiff to: "cease and desist from sending nuisance messages or otherwise contacting Deputy Commissioner Reznick and Chief Spinella."  Byrne's letter expressly stated that "[t]he

subject matter of these communications are complaints previously reported by you to the 121stst Precinct and the Internal Affairs Bureau."

67.     Notwithstanding the fact that Plaintiff's communications with Reznick and Spinella were protected by the First Amendment, that Reznick had previously invited Plaintiff to communicate with him if his complaints were not being handled properly, and that the only time that Plaintiff's complaints ever seemed to get any attention was when he addressed issues directly to Reznick and Spinella, Byrne's letter further asserted that "these communications serve no legitimate purpose and may be in violation of law," without actually citing any particular law that Plaintiff may have broken.  Byrne went further and threatened Plaintiff with "arrest and prosecution for violations of the [unspecified] New York State Penal Law.  Should you choose to continue in your course of conduct, the NYPD will pursue any and all remedies, both criminal and civil.  Any nuisance communication will be deemed a violation of this order.  Do not respond to this letter.  The NYPD considers this matter closed."

68.     As directed in the Notice, Plaintiff began calling the License Division investigator assigned to his case, Aybar, to inquire about the status of the investigation and provide whatever information was necessary to get the License Division to return his license and handguns.  Plaintiff told Aybar, and other Licensing Division officers with whom he communicated, that he urgently needed his license and handguns back because of the harassment that he was being subjected to, the potential for reprisals based upon his prior undercover status, and his inability to protect himself and his wife if needed.

69.     On March 28, 2018, Aybar informed Plaintiff that he and another License Division officer, Sergeant Brian Hebert, had concluded their reviews and that Plaintiff's folder was with Barreto, the Licensing Division's Commanding Officer, for final disposition.

70.     On April 18, 2018, retired NYPD Detective Vito Palazzo filed a complaint against Rodriguez for aggravated harassment with the 122 Precinct, which is located at 2320 Hylan Boulevard, Staten Island, New York.  Palazzo, who was a former partner of Plaintiff's in the NYPD, had received seventeen emails from Rodriguez, each of which contained content harassing and mocking Plaintiff, including jokes about the fact that Plaintiff's handguns had been removed by the NYPD License Division.  The complaint that Palazzo filed was closed with no further action.

71.     On that same day, while driving up and down the street outside of Plaintiff's apartment, Rodriguez screamed and yelled "Billy no guns, where are your guns now bitch!" and similar phrases, all as part of his continued campaign of harassing Plaintiff.  Rodriguez even created an email account with the address billyhasnoguns@gmail.com, through which he sends harassing emails to Plaintiff.  Plaintiff never informed Rodriguez that his handguns had been seized.

72.     On April 19, 2018, Palazzo called the License Division to let Aybar know about the complaint that he had filed against Rodriguez and also about Rodriguez's comments regarding Plaintiff's guns being removed by the License Division.  Aybar forwarded the call to Herbert, who then spoke with Palazzo about Plaintiff's case.  Herbert informed Palazzo that the Licensing Division had no issues or problems with Plaintiff's compliance with the rules and procedures of the License Division.  Herbert further explained that Plaintiff's license had been suspended on the order of Deputy Commissioner Reznick, whom he stated had done the same thing before.

73.     On May 10, 2018, Plaintiff emailed Barreto requesting that his license be restored and that his handguns be returned.  Plaintiff explained and described the interactions that he had had with members of the License Division, and conveyed that from everything that he and Palazzo had been told, there was no legal basis for the License Division to have suspended his license in the first

instance or to continue the suspension of his license.  Plaintiff did not receive a response from Barreto, nor has Plaintiff ever received a written Notice of Determination Letter or been provided with a hearing to appeal his license suspension, as required by § 5-30(h) of the licensing law.

74.     On May 11, 2018, Plaintiff submitted a FOIL request to the City seeking records related to the complaints that he had filed with the 121st Precinct and his reports to IAB.  On May 15, 2018, the City denied his request.  Plaintiff submitted an appeal that same day, and the City denied his appeal on May 16, 2018.

75.     On June 19, 2018, Plaintiff filed a complaint with the NYCDOI requesting that the NYCDOI investigate Defendants Reznick and Barreto, along with Licensing Division officers Aybar, Herbert, and Browne, and 121st Precinct Commanding Officer Harrington for their roles in regard to his license suspension and seized handguns, as well as the failure of the 121st Precinct to investigate his complaints.  Plaintiff's complaint resulted in Senior Investigator John Kim opening two cases: #C18-0260 & #C18-0269.  Almost four months later, on or about October 15, 2018, Kim and his supervisor, Brigitte Watson, told Plaintiff that they had requested records and information from the NYPD nearly four months ago, but that the NYPD was not cooperating with those requests.  They also told Plaintiff that such lack of cooperation was not normal.  Kim subsequently suggested to Plaintiff that he retain a lawyer.

76.     On December 7, 2018, Investigator Marksman of the NYCDOI informed Plaintiff that his case (C18-0269) was still active but currently unassigned to any investigator.  Marksman told Plaintiff that he would be notified once the case was assigned to another investigator.

77.     As of the date of filing of this action, Plaintiff has never received a Notice of Determination Letter or a hearing regarding his license suspension, and his license and handguns remain in the custody of the NYPD License Division.

78.     Defendants, by illegally retaliating against Plaintiff, have caused Plaintiff to suffer both economic and non-economic damages including the deprivation of Constitutional rights, lost income, significant expenses, mental anguish, and emotional distress.  Indeed, Plaintiff has been disarmed by the Defendants while being subjected to continuing harassment and threats, leaving Plaintiff to live in constant fear for both his and his wife's lives.

**City Defendants' December 20, 2018, Arrest of Plaintiff**

79.     On October 11, 2018, as directed by Defendant Reznick and based on information from Defendant Reznick and Defendant Rodriguez, Defendant Butler executed an affidavit in support of a search warrant of Plaintiff's premises that contained false information, including, but not limited to, characterizing Plaintiff's complaints made to 311 as being "false" and "fictitious," despite not conducting any investigation into these complaints and having no basis to believe that they were false or fictitious.  In the same affidavit, Defendant Butler also fabricated information by, *inter alia*, alleging that Plaintiff had "advanced technological sophistication" in an attempt to create a sense of urgency for the execution of the search warrant.

80.     The Honorable Mario Mattei of the Supreme Court of the State of New York, County of Richmond, granted the search warrant application based on Defendant Butler's affidavit on December 17, 2018.

81.     The stated purpose of the search warrant was to search for and obtain various computer data and electronic records.  However, City Defendants actually obtained the search warrant with the intent of searching Plaintiff's premises for, and seizing, any and all firearms in his possession, in a continued effort to retaliate against Plaintiff.  Indeed, Defendant Butler peripherally mentioned in his affidavit in support of applying for the search warrant that Plaintiff "has been known to carry firearms prior to his firearms license being suspended and has threatened violence against multiple

individuals in the past," despite firearms not being a subject of the search warrant and Defendant Butler not having reason to believe that Plaintiff legitimately threatened violence against anyone in his civilian life.

82.     On December 20, 2018, NYPD officers, including, but not limited to, Police Sergeant John Jackson, Defendant Butler, Defendant Burgess, and Police Officer Tropiano, approached Plaintiff's place of residence and knocked on his door to execute the search warrant.  Plaintiff answered the door and spoke to Defendant Butler.  Defendant Butler told Plaintiff that he had received a complaint about domestic violence, despite not having received any such complaint, and needed to enter his residence, before forcibly pushing open Plaintiff's door and effecting entry to Plaintiff's residence without his consent.

83.     After Defendant Butler and the accompanying NYPD officers entered Plaintiff's residence, Butler handed Plaintiff a piece of paper, claiming that it was a search warrant, but within seconds, he snatched it back out of Plaintiff's hands before Plaintiff could look at it, all in full view of the City's other NYPD officers who did nothing to prevent this conduct.

84.     Moments later, Defendant Butler and the NYPD officers forcibly assaulted Plaintiff by throwing him to the ground, causing Plaintiff to hit the side of his couch as he was falling and to sustain an injury to his left orbital, left shoulder, and lower back. Defendant Butler and the NYPD officers then forcibly handcuffed Plaintiff and escorted him out of his residence.

85.     The NYPD proceeded to search Plaintiff's home, in areas not subject to the search warrant, and seize Plaintiff's property, which also was not the subject of the search warrant, including, but not limited to, Plaintiff's two Mossberg Model 590 Shockwave firearms, which Defendants Butler, Burgess, and the NYPD officers knew were legal to own, even without a license, due to, *inter alia*,

the length of the firearms' barrels and their pistol grips, as well as two electronic stun guns and ammunition.

86.     Defendant Butler then placed Plaintiff in an NYPD vehicle and directed that Plaintiff be transported to the 121st Precinct, where Plaintiff remained, against his will, until he was transported to Richmond University Hospital to receive treatment for his injuries.   Afterward, NYPD officers transported Plaintiff back to the 121st Precinct, where he remained, in total, for approximately fourteen hours.   NYPD officers then forcibly transported Plaintiff to the 120th Precinct, where Plaintiff continued to be imprisoned for approximately an additional twelve hours.

87.     Following the execution of the search warrant, and in furtherance of Plaintiff's prosecution, Defendant Butler generated police paperwork attributing all items recovered - - including, but not limited to, the firearms, stun guns, and ammunition, to Plaintiff - - despite not having probable cause or reasonable suspicion to do so, as Plaintiff was not in possession of the items at the time that they were seized and Plaintiff lived with his wife in the same residence that was searched. Additionally, in his paperwork, Defendant Butler repeatedly characterized Plaintiff's Mossberg Model 590 Shockwave firearm as "shotguns," and/or "12-guage shotguns," in an effort to charge Plaintiff with crimes that he did not commit, the falsity of which is evident through subsequent NYPD members completing paperwork that correctly characterized the firearms as "other" or "other weapon."

88.     On December 21, 2018, in furtherance of Plaintiff's prosecution, Defendant Butler executed an accusatory instrument, containing false and fabricated information, including, but not limited to, falsely categorizing each of Plaintiff's firearms as being a "shotgun," and stating that "with intent to use the same unlawfully against another did possess a loaded firearm." Additionally, in furtherance of Plaintiff's prosecution, Defendant Butler intentionally omitted any

27

information concerning Plaintiff's wife living at the same address and her presence during the execution of the search warrant.

89.     That same day, Plaintiff was arraigned in Richmond County Criminal Court on false and fabricated charges, including, but not limited to, the felonies of Criminal Possession of a Weapon in the Second Degree, Penal Law ("PL") 265.03, two counts of Criminal Possession of a Firearm, PL 265.1B, and the misdemeanors of two counts of Criminal Possession of a Weapon in the Fourth Degree, PL 265.01, Obstructing Governmental Administration, PL 195.05, and Resisting Arrest, PL 205.30, all of which Plaintiff did not commit, and City Defendants knew, or should have known, that he did not commit.

90.     At arraignment, bail was set at $5,000.00, which Plaintiff's brother paid the same day, and Plaintiff was released.

**City Defendants' January 14, 2020, Arrest of Plaintiff**

91.     During the pendency of the criminal prosecution related to Plaintiff's December 20, 2018 arrest, on or about January 14, 2020, at approximately 8:30 a.m., in the vicinity of the NYPD 120th Precinct, located at 78 Richmond Terrace, Staten Island, New York 10301, the City's NYPD officers, including, but not limited to, Detective Butler, arrested Plaintiff again and charged Plaintiff with twenty-three counts of Criminal Impersonation in the Second Degree, twenty-two counts of Falsely Reporting an Incident in the Third Degree, twenty-two counts of Aggravated Harassment in the Second Degree, five counts of Harassment in the Second Degree, one count of Stalking in the Fourth Degree, and one count of Menacing in the Second Degree, all of which were crimes that Detective Butler knew, should have known, or had reason to believe that Plaintiff did not commit, and did not have probable cause or reasonable suspicion to believe that Plaintiff had committed.

92.     Plaintiff was arraigned in Richmond County Criminal Court in connection with his January 14, 2020, arrest on that same day.

93.     Plaintiff's prosecutions in connection with his December 20, 2018, and January 14, 2020 arrests, were joined and transferred to Richmond County Supreme Court, Criminal Term, on March 3, 2020, under the modified title "C docket 00225C-2020," although it continued to have the tracking number associated with Plaintiff's initial indictment, "623/2018."

94.     That same day, Defendant Butler made false statements in furtherance of Plaintiff's prosecution while testifying at Plaintiff's grand jury hearing, including, but not limited to, false allegations that Plaintiff prevented the NYPD officers from executing the search warrant, and characterizing the Mossberg Model 590 Shockwaves as shotguns despite being aware that they were not properly characterized as shotguns.

95.     Thereafter, Plaintiff's prosecution for the cumulative false and fabricated charges lasted for, approximately, an additional two years and seven months, until July 12, 2022, largely due to City Defendants' insistence that none of the charges against Plaintiff be dismissed.

96.     Beginning before, but lasting throughout, the approximate three-and-one-half years of Plaintiff's prosecution, City Defendants acted in cooperation in furtherance of Plaintiff's prosecution by making false statements against him, which they knew to be, should have known, or had reason to believe, were false, in an effort to achieve the collateral objective of exacting retribution due to Plaintiff's prior undercover work for the NYPD's Internal Affairs Division, where his job was to investigate and effectuate the arrest of NYPD officers who broke the law, as well as in retaliation for Plaintiff's prior complaints to the NYPD, through the 121st Precinct, seeking redress for multiple unanswered complaints requesting investigation into, and assistance

with, Defendant Rodriguez, who stalked and harassed Plaintiff, and who continues to stalk and harass Plaintiff to this day, with impunity from the NYPD.

97.    On January 8, 2021, Richmond County Supreme Court, Criminal Term, dismissed the felony charges against Plaintiff for Criminal Possession of a Weapon in the Second Degree, PL 265.03, Criminal Possession of a Weapon in the Third Degree, PL 265.02, and two counts of Criminal Possession of a Firearm, PL 265.01.  Thereafter, on July 12, 2022, all remaining charges against Plaintiff were finally dismissed and the entire criminal case terminated in Plaintiff's favor, ending the approximate three and one-half-year period where Plaintiff was denied his rights to substantive due process, to possess a firearm, and his ability to freely travel.

98.    Additionally, beginning before, but lasting throughout, the approximate three-and-one-half years of Plaintiff's prosecution, City Defendants acted in concert with Defendant Rodriguez to deprive Plaintiff of his constitutional rights, by working together to manufacture evidence that was used to obtain the search warrant of Plaintiff's premises, and in furtherance of Plaintiff's prosecution on false and fabricated charges.  Additionally, during this time period, and continuing through today, City Defendants are acting in conspiracy with Defendant Rodriguez to deprive Plaintiff of his constitutional rights by allowing Defendant Rodriguez to continue to harass and stalk Plaintiff by ignoring Plaintiff's calls to the NYPD for assistance, and by instructing other NYPD members to do the same, despite the actions being taken by Defendant Rodriguez being in clear violation of the law.  By way of example only, on February 24, 2021, after being repeatedly ignored by NYPD officers of the 121st Precinct, Plaintiff went to the 122nd Precinct to attempt to make a complaint about being harassed and stalked by Defendant Rodriguez.  In response, NYPD Lieutenant John Lomando of the 122nd Precinct initially refused to make a report of Plaintiff's complaint, challenged Plaintiff's "credibility," and made statements implying that his complaint

was not true because Plaintiff had been previously accused of making false complaints, despite Plaintiff not having been convicted of anything, before eventually conceding to make a report to send to the 121th Precinct, but only of an "unknown perp," despite being provided with Defendant Rodriguez's name and address.  Indeed, Defendant Rodriguez continues to harass Plaintiff on a regular basis, often by driving past Plaintiff's home in various vehicles, but also by following Plaintiff in said vehicles, occasionally making lewd gestures at Plaintiff, driving in illegal and dangerous manners to threaten Plaintiff's safety, and on at least one occasion, throwing objects at Plaintiff from his vehicle.  City Defendants continue to refuse to respond to Plaintiff's complaints or address any of the incidents of harassment.

99.     Despite all charges against Plaintiff having been dismissed, in a continued effort to retaliate against Plaintiff, City Defendants prevented Plaintiff from obtaining his property that the City Defendants wrongfully seized from him, including, but not limited to, his two Mossberg firearms, stun guns, much of which was subsequently designated by the Richmond County District Attorney's Office to be released on July 12, 2022, including, but not limited to, his two computers, flash drives, camera, and cellphone.

100.    Defendants Butler, Burgess, Reznick, and Doe, each had the opportunity to intervene on Plaintiff's behalf to prevent the unlawful and unconstitutional conduct of their fellow officers, but they each failed and refused to take any such actions, as the City failed to train them how to lawfully act under such circumstances.

**AS FIRST CLAIM FOR RELIEF AGAINST DEFENDANTS CITY,
REZNICK, SPINELLA, IQBAL, AND BARRETO**
*(Violations of the Freedom of Speech and Right to Petition provisions of
the First Amendment of the United States Constitution, vis-à-vis the Due
Process Clause of the Fourteenth Amendment of the United States
Constitution, vis-à-vis Section 1983 of Title 42 of the United States Code)*

101.    Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

102.    The aforementioned retaliatory acts of Defendants Reznick, Spinella, Iqbal, and Barreto, including their suspension of Plaintiff's license, confiscation of Plaintiff's license and handguns, refusal to reinstate Plaintiff's license and return his license and handguns, refusal to cooperate with the investigation of the NYCDOI, and the arrest of Plaintiff on December 20, 2018, are in violation of Plaintiff's rights under the First Amendment of the United States Constitution, vis-à-vis the Fourteenth Amendment and 42 U.S.C. § 1983.

103.    As described above, Plaintiff engaged in protected activity under the First and Fourteenth Amendments by reporting, and seeking to redress, instances of malfeasance and unlawful acts and orders by members of the 121st Precinct, IAB, the Licensing Division, and the Individual Defendants.

104.    As described above, Defendants Reznick, Spinella, Iqbal, and Barreto, while acting under color of law, specifically 38 RCNY § 5-30(d), and in accordance with the customs and usages of the NYPD, willfully and maliciously deprived Plaintiff of rights, privileges, and immunities under the First Amendment by retaliating against Plaintiff for exercising his rights to free speech and to petition the government by taking the above-described actions against him.

105.    As described above, Defendant City, through its promulgation of 38 RCNY Chapter 5, its delegation of authority to the NYPD Commissioner to establish further conditions and limitations regarding handgun ownership, and its delegation to the NYPD Commissioner and inferior NYPD

officers to carry out the rules and regulations set forth therein, caused, and is therefore liable for, the violations of Plaintiff's constitutional rights at the hands of those duly authorized employee agents of the City in carrying out the City's express policy.  None of the actions of Defendants Reznick, Spinella, Iqbal, and Barreto, nor of the non-party violators Browne and Soon, who actually effected the constitutional violations in express reliance upon 38 RCNY § 5-30(d), would have been possible if not done under the color of law and in accordance with the customs and usages of the NYPD.

106.    As a direct and proximate result of Defendants Reznick, Spinella, Iqbal, and Barreto's violations of Plaintiff's First Amendment rights, Plaintiff has suffered, and continues to suffer, loss of income as well as severe mental anguish and emotional distress, for which he is entitled to an award of monetary damages and other relief.

107.    Plaintiff is also entitled to an award of punitive damages from Defendants Reznick, Spinella, Iqbal, and Barreto, due to their malicious, willful, and wanton violations of Plaintiff's First Amendment rights.

### SECOND CLAIM FOR RELIEF AGAINST DEFENDANTS CITY, REZNICK, SPINELLA, IQBAL, AND BARRETO
*(Violations of the Right to be free from Unreasonable Seizures under the Fourth Amendment of the United States Constitution, vis-à-vis the Due Process Clause of the Fourteenth Amendment of the United States Constitution, vis-à-vis Section 1983 of Title 42 of the United States Code)*

108.    Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

109.    The aforementioned acts of Defendants Reznick, Spinella, Iqbal, and Barreto, including their suspension of Plaintiff's license, confiscation of Plaintiff's license and handguns, and refusal to reinstate Plaintiff's license and return his license and handguns are in violation of Plaintiff's

rights under the Fourth Amendment of the United States Constitution, vis-à-vis the Fourteenth Amendment and 42 U.S.C. § 1983.

110.    As described above, Plaintiff engaged in activity protected under the Second and Fourteenth Amendments by properly obtaining and maintaining a license to possess handguns from the NYPD License Division and owning five handguns in accordance with that license.

111.    As described above, Defendants Reznick, Spinella, Iqbal, and Barreto, while acting under color of law, specifically 38 RCNY § 5-30(d), and in accordance with the customs and usages of the NYPD, willfully and maliciously deprived Plaintiff of rights, privileges, and immunities under the Fourth Amendment by unreasonably seizing Plaintiff's property in violation of the Fourth Amendment.

112.    As described above, Defendant City, through its promulgation of 38 RCNY Chapter 5, its delegation of authority to the NYPD Commissioner to establish further conditions and limitations regarding handgun ownership, and its delegation to the NYPD Commissioner and inferior NYPD officers to carry out the rules and regulations set forth therein, caused, and is therefore liable for, the violations of Plaintiff's constitutional rights at the hands of those duly authorized employee agents of the City in carrying out the City's express policy.  None of the actions of Defendants Reznick, Spinella, Iqbal, and Barreto, nor of the non-party violators Browne and Soon, who effected the constitutional violations in express reliance upon 38 RCNY § 5-30(d), would have been possible if not done under the color of law and in accordance with the customs and usages of the NYPD.

113.    As a direct and proximate result of Defendants Reznick, Spinella, Iqbal, and Barreto's violations of Section 1983, Plaintiff has suffered, and continues to suffer, loss of income as well

as severe mental anguish and emotional distress, for which he is entitled to an award of monetary damages and other relief.

114.   Plaintiff is also entitled to an award of punitive damages from Defendants Reznick, Spinella, Iqbal, and Barreto, due to their malicious, willful, and wanton violations of Section 1983.

**THIRD CLAIM FOR RELIEF AGAINST DEFENDANTS CITY, REZNICK, SPINELLA, IQBAL, AND BARRETO** *(Violations of the Right to Keep and Bear Arms under the Second Amendment of the United States Constitution, vis-à-vis the Due Process Clause of the Fourteenth Amendment of the United States Constitution, vis-à-vis Section 1983 of Title 42 of the United States Code)*

115.   Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

116.   The aforementioned acts of Defendants Reznick, Spinella, Iqbal, and Barreto, including their suspension of Plaintiff's license, confiscation of Plaintiff's license and handguns, and refusal to reinstate Plaintiff's license and return his license and handguns are in violation of Plaintiff's rights under the Second Amendment of the United States Constitution, vis-à-vis the Fourteenth Amendment and 42 U.S.C. § 1983.

117.   As described above, Plaintiff engaged in activity protected under the Second and Fourteenth Amendments by properly obtaining and maintaining a license to possess handguns from the NYPD License Division and owning five handguns in accordance with that license.

118.   As described above, Defendants Reznick, Spinella, Iqbal, and Barreto, while acting under color of law, specifically 38 RCNY § 5-30(d), and in accordance with the customs and usages of the NYPD, willfully and maliciously deprived Plaintiff of rights, privileges, and immunities under the Second Amendment by taking the above-described actions against him without justification.

119.   As described above, Defendant City, through its promulgation of 38 RCNY Chapter 5, its delegation of authority to the NYPD Commissioner to establish further conditions and limitations

regarding handgun ownership, and its delegation to the NYPD Commissioner and inferior NYPD officers to carry out the rules and regulations set forth therein, caused, and is therefore liable for, the violations of Plaintiff's constitutional rights at the hands of those duly authorized employee agents of the City in carrying out the City's express policy.  None of the actions of Defendants Reznick, Spinella, Iqbal, and Barreto, nor of the non-party violators Browne and Soon, who actually effected the constitutional violations in express reliance upon 38 RCNY § 5-30(d), would have been possible if not done under the color of law and in accordance with the customs and usages of the NYPD.

120.    As a direct and proximate result of Defendants Reznick, Spinella, Iqbal, and Barreto's violations of Plaintiff's Second Amendment rights, Plaintiff has suffered, and continues to suffer, loss of income as well as severe mental anguish and emotional distress, for which he is entitled to an award of monetary damages and other relief.

121.    Plaintiff is also entitled to an award of punitive damages from Defendants Reznick, Spinella, Iqbal, and Barreto due to their malicious, willful, and wanton violations of Section 1983.

122.    Additionally, Plaintiff is further entitled to a writ of mandamus ordering Defendant City to reinstate Plaintiff's license and return Plaintiff's license and handguns.

## FOURTH CLAIM FOR RELIEF AGAINST DEFENDANT CITY
### *(Declaration of Rights Pursuant to 28 U.S.C. §2201)*

123.    Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

124.    Plaintiff's right to keep and bear arms under the Second Amendment of the United States Constitution, made applicable to the City vis-à-vis the Fourteenth Amendment and 42 U.S.C. § 1983, were violated by the individual City Defendants' aforementioned retaliatory acts, including City Defendants' suspension of Plaintiff's license, confiscation of Plaintiff's license and handguns,

and refusal to reinstate Plaintiff's license and return his license and handguns, all of which were done under color of law and by way of authority and power granted to them by the City, and in accordance with the customs and usages of the NYPD, under then-Title 38 RCNY § 5-01 *et seq.*

125.    The Second Amendment's guarantee that "the right of the people to keep and bear arms shall not be infringed" has been held to guarantee the central right of self-defense, particularly in the home, where the need for defense of self, family, and property is most acute.  While the guarantees of the Second Amendment are not absolute, a rule or regulation, such as then-38 RCNY § 5-30(d), which under the pretense of regulating amounted to a destruction of the right, and for which there are no historical regulations that impose a comparably vague and arbitrary burden, was unconstitutional.

126.    The rules and regulations set forth in then-Title 38 RCNY § 5-01 *et seq.* were promulgated by Defendant City.  Under § 5-08, the City had delegated to the NYPD Commissioner the authority to establish conditions and limitations on, among other things, "the permissible number, type, transportation and safeguarding of handguns," and the authority to enforce these rules and regulations, as well as the conditions and limitations, were vested in the License Division.

127.    While multiple provisions of then-38 RCNY § 5-01 *et seq* were of dubious constitutional validity, Plaintiff's rights were specifically violated under § 5-30(d), a section that was unconstitutionally vague and overly broad, and which gave the NYPD effectively unlimited authority to suspend a valid license and seize lawfully owned firearms whenever it wants, thereby destroying license-holders' rights.

128.    Then-Section 5-30(d) read: "In addition to the aforementioned 'Incidents,' whenever the holder of a handgun license becomes involved in **a situation** which **comes to the attention of** any police department, or other law enforcement agency, the licensee shall immediately notify the

License Division's Incident Section of the details." (Emphasis added).  Neither "situation" nor "comes to the attention of" was defined anywhere in 38 RCNY § 5-01 *et seq.*, nor were those terms used anywhere else within those rules and regulations.  However, "Incidents" was defined, and all types of "Incidents" were made reportable to the License division in § 5-30(a)-(c), and they generally all involved circumstances where the licensee has committed a crime and/or compromised the safety of a firearm or license either through negligence or as the result of a mental or physical condition.  None of the specific categories of "Incidents" defined in §§ 5-30(a)-(c) applied to Plaintiff.

129.    Additionally, 38 RCNY § 5-10(a)-(n) listed fourteen different factors that were grounds for the denial of a handgun license in the first instance.  Denial of a license was provided for "where it is determined that an applicant lacks good moral character or that other good cause exists for denial."  Being the victim of multiple crimes and reporting those crimes to the police was not a listed basis for denial of a license.

130.    Read in context with the whole of 38 RCNY § 5-01 *et seq.*, the sections defining "Incidents" made clear that the purpose of reporting to the License Division was to make the License Division aware of issues that could jeopardize public safety, and thus arguably justify the suspension of a license.  However, under no reasonable interpretation of the rules could being a crime victim, reporting a crime to the police, or exercising one's First Amendment Rights, have been considered to be an issue that jeopardized public safety.  And yet, as written, and as applied to Plaintiff, that is exactly what this rule allowed.  Further evidencing the overreach of §5-30(d), nothing in this section required that the "situation" have any relationship to gun ownership or public safety, and read literally, the section did not even require that the license-holder actually be

aware of the fact that they have come to the attention of law enforcement for them to violate the regulation and have their license suspended.

131.    Even if § 5-30(d) were not found to be unconstitutionally vague and overly broad on its face, it would nonetheless still violate the Second Amendment as applied.  As stated above, one of the central rights that the Supreme Court of the United States has found to be protected by the Second Amendment is that of the right of self-defense, particularly the defense of ones-self and his/her family in the home.  While that right is not unlimited, as a fundamental right it can only be limited by reasonable restrictions that are necessary for the protection of the general welfare and for which the governing entity can identify a well-established and representative historical analogue.  Here, a restriction that allowed the NYPD to suspend a license and seize firearms from a crime victim, whom may well need those firearms to protect him/herself and his/her family from the perpetrator of those crimes, cannot be seen as a reasonable restriction intended to protect the general public, nor are there any historical regulations that impose a comparably vague and arbitrary burden on an individual's Second Amendment rights.  Moreover, when the suspension and seizure is predicated on the failure to comply with a vague administrative notice provision, unrelated to any criminal or negligent act committed by the license-holder, such a measure must be seen as inherently unreasonable and certainly not sufficient to justify violating a fundamental right.

132.    Based upon the above, Plaintiff requests that the Court enter a declaratory judgment that 38 RCNY §5-30(d) was unconstitutional, either facially or as applied.

133.    Additionally, because this violation is capable of repetition while evading review, even if Defendants reinstate Plaintiff's license and return his handguns, Plaintiff requests that the Court address this constitutional issue and enter the requested declaratory judgment.

**FIFTH CLAIM FOR RELIEF AGAINST DEFENDANTS REZNICK,
BUTLER, AND DOE**
*(Violations of the Fourth, Fifth, and Sixth Amendments, vis-à-vis the Fourteenth Amendment of the
United State Constitution, vis-a-vis 42 U.S.C. § 1983: Malicious Prosecution)*

134.    Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

135.    The aforementioned acts of Defendants Reznick, Butler, and Doe, while acting under color of law in maliciously prosecuting Plaintiff, despite not having probable cause or reasonable suspicion to do so, are in willful and malicious violation of Plaintiff's rights under the Fourth, Fifth, and Sixth Amendments of the United States Constitution, vis-à-vis the Fourteenth Amendment and 42 U.S.C. § 1983.

136.    As a direct and proximate result of Defendants Reznick, Butler, and Doe's unconstitutional actions in violation of Section 1983, Plaintiff has suffered, and continues to suffer, economic damages, including, but not limited to, lost profits and out-of-pocket expenses.

137.    As a direct and proximate result of Defendants Reznick, Butler, and Doe's unconstitutional actions in violation of Section 1983, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, loss of self-esteem, self-confidence, personal dignity, harm to his personal and professional reputations, stress and anxiety, and emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

138.    Defendants Reznick, Butler, and Doe's unconstitutional actions also constitute malicious, willful, and wanton violations of Section 1983, for which Plaintiff is entitled to an award of punitive damages.

## SIXTH CLAIM FOR RELIEF AGAINST DEFENDANT BUTLER
*(Violations of the Fifth and Sixth Amendments, vis-à-vis the Fourteenth Amendment, vis-a-vis 42 U.S.C. § 1983: Denial of Right to Fair Trial)*

139.    Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

140.    The aforementioned acts of Defendant Butler, while acting under color of law, in denying Plaintiff his right to a fair trial, were in willful and malicious violation of Plaintiff's rights under the Fifth and Sixth Amendments of the United States Constitution, vis-à-vis the Fourteenth Amendment and 42 U.S.C. § 1983.

141.    As a direct and proximate result of Defendant Butler's unconstitutional actions in violation of Section 1983, Plaintiff has suffered, and continues to suffer, economic damages, including, but not limited to, legal fees, lost profits, and out-of-pocket expenses.

142.    As a direct and proximate result of Defendant Butler's unconstitutional actions in violation of Section 1983, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, loss of self-esteem, self-confidence, personal dignity, harm to his personal and professional reputations, stress and anxiety, and emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

143.    Defendant Butler's unconstitutional actions also constitute malicious, willful, and wanton violations of Section 1983, for which Plaintiff is entitled to an award of punitive damages.

## SEVENTH CLAIM FOR RELIEF AGAINST DEFENDANTS REZNICK, BUTLER, AND RODRIGUEZ
*(Violations of the Fifth and Sixth Amendments, vis-à-vis the Fourteenth Amendment, vis-a-vis 42 U.S.C. § 1983: Civil Conspiracy)*

144.    Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

41

145.    The aforementioned acts of Defendants Reznick, Butler, while acting under color of law, along with Defendant Rodriguez, in falsifying information and using said information in NYPD documentation, and providing said information to the Richmond County District Attorney's Office with the intent to have Plaintiff wrongfully arrested and maliciously prosecuted, and to otherwise abuse the criminal prosecution process to retaliate against Plaintiff, harass Plaintiff, and have Plaintiff's firearms confiscated, despite not having probable cause or any justifiable reason to do so, violated Plaintiff's rights under the Fifth and Sixth Amendments of the United States Constitution, vis-à-vis the Fourteenth Amendment and 42 U.S.C. § 1983.

146.    As a direct and proximate result of Defendants Reznick, Butler, and Rodriguez's unconstitutional actions in violation of Section 1983, Plaintiff has suffered, and continues to suffer, economic damages, including, but not limited to, legal fees, lost profits, and out-of-pocket expenses.

147.    As a direct and proximate result of Defendants Reznick, Butler, and Rodriguez's unconstitutional actions in violation of Section 1983, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, loss of self-esteem, self-confidence, personal dignity, harm to his personal and professional reputations, stress and anxiety, and emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

148.    Defendants Reznick, Butler, and Rodriguez's unconstitutional actions also constitute malicious, willful, and wanton violations of Section 1983, for which Plaintiff is entitled to an award of punitive damages.

**EIGHTH CLAIM FOR RELIEF AGAINST DEFENDANTS BUTLER,
BURGESS, AND DOE**
*(Violations of the Fourth, Fifth, Sixth, and Eighth Amendments, vis-à-vis the Fourteenth
Amendment, vis-a-vis 42 U.S.C. § 1983: Failure to Intervene)*

149.     Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

150.     The aforementioned acts of Defendants Butler, Burgess, and Doe, in failing to intervene to prevent and/or stop the aforesaid improper and unconstitutional conduct by their fellow officers, despite having the opportunity to do so, constituted violations of those same rights that were violated by their fellow officers, including violations of Plaintiff's rights under the Fourth, Fifth, Sixth, and Eighth Amendments of the United States Constitution, vis-à-vis the Fourteenth Amendment and 42 U.S.C. § 1983.

151.     As a direct and proximate result of Defendants Butler, Burgess, and Doe's unconstitutional actions in violation of Section 1983, Plaintiff has suffered, and continues to suffer, economic damages, including, but not limited to, lost profits and out-of-pocket expenses.

152.     As a direct and proximate result of Defendants Butler, Burgess, and Doe's unconstitutional actions in violation of Section 1983, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, loss of self-esteem, self-confidence, personal dignity, harm to his personal and professional reputations, stress and anxiety, and emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

153.     Defendants Butler, Burgess, and Doe's unconstitutional actions also constitute malicious, willful, and wanton violations of Section 1983, for which Plaintiff is entitled to an award of punitive damages.

## NINTH CLAIM FOR RELIEF AGAINST CITY DEFENDANTS
### *(State Law Violation: Malicious Prosecution)*

154.    Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

155.    As fully described above, in violation of New York law, City Defendants maliciously initiated and acted in furtherance of Plaintiff's prosecution, without probable cause, for which the City is vicariously liable under the doctrine of *respondeat superior*.

156.    City Defendants' malicious prosecution of Plaintiffs commenced in Richmond County Supreme Court, Criminal Term, and were consolidated under Criminal Court Docket Number, "C docket 00225C-2020."  The prosecution terminated favorably to Plaintiff, in its entirety, on July 13, 2022.

157.    As a direct and proximate result of City Defendants' malicious prosecution, Plaintiff has suffered, and continues to suffer, economic damages, including, but not limited to, legal fees, lost profits, and out-of-pocket expenses.

158.    As a direct and proximate cause of City Defendants' malicious prosecution of Plaintiff, Plaintiff has suffered, and continue to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, loss of self-esteem, self-confidence, personal dignity, harm to his personal and professional reputations, stress and anxiety, and emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

159.    The individual City Defendants' actions in violation of state law were motivated by actual malice, thus, Plaintiff is entitled to an award of punitive damages.

### TENTH CLAIM FOR RELIEF AGAINST CITY DEFENDANTS
*(State Law Violation: Abuse of Process)*

160.    Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

161.    As fully described above, in violation of New York law, City Defendants maliciously initiated and acted in furtherance of Plaintiff's prosecution, without probable cause to believe Plaintiff committed the crimes that City Defendants accused him of and provided false evidence in support of, with the intent to harass Plaintiff and have his firearms wrongfully seized, for which the City is vicariously liable under the doctrine of *respondeat superior*.

162.    As a direct and proximate result of City Defendants' abuse of the criminal prosecutorial process, Plaintiff has suffered, and continues to suffer, economic damages, including, but not limited to, legal fees, lost profits, and out-of-pocket expenses.

163.    As a direct and proximate cause of City Defendants' abuse of the criminal prosecutorial process, Plaintiff has suffered, and continue to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, loss of self-esteem, self-confidence, personal dignity, harm to his personal and professional reputations, stress and anxiety, and emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

164.    The individual City Defendants' actions in violation of state law were motivated by actual malice, thus, Plaintiff is entitled to an award of punitive damages.

### ELEVENTH CLAIM FOR RELIEF AGAINST DEFENDANT CITY
*(State Law Violation: Conversion)*

165.    Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

166.     As fully described above, City Defendants illegally and wrongfully seized various property belonging to Plaintiff, including but not limited to, his two Mossberg firearms, stun guns, computers, flash drives, camera, and ammunition.

167.     As further described above, on June 22, 2022, all charged brought against Plaintiff were dismissed, thus necessitating the release of Plaintiff's wrongfully confiscated property back to Plaintiff.

168.     Nevertheless, City Defendants intentionally withheld, failed to return, and otherwise destroyed Plaintiff's property, in violation of New York common law, for which the City is vicariously liable under the doctrine of *respondeat superior*.

169.     As a direct and proximate result of City Defendants' conversion of Plaintiff's property, Plaintiff has suffered, and continues to suffer, economic damages, including, but not limited to, the value of his stolen property.

## ELEVENTH CLAIM FOR RELIEF AGAINST DEFENDANT CITY
### *(State Law Violation: Negligent Training and Retention)*

170.     Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

171.     As fully described above, prior to the events alleged herein, the City knew, or reasonably should have known, that Defendants Reznick, Butler, Burgess, and Doe had maliciously prosecuted, denied substantive due process, violated constitutional rights, and otherwise abused their authority against individuals while in the course and scope of their employment with the City and the NYPD, and were unfit to act as police officers.

172.     The City also did not properly train Defendants Reznick, Butler, Burgess, and Doe, not to act in violation of the constitution and civil rights of its citizenry, including Plaintiff.

173.   Despite the City's prior knowledge that Defendants Reznick, Butler, Burgess, and Doe were unfit to serve as police officers, the City knowingly retained Defendants Reznick, Butler, Burgess, and Doe, thereby subjecting Plaintiff to their improper, illegal, and unconstitutional conduct.

174.   As a direct and proximate cause of the City's negligent training, supervision, and retention, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, loss of self-esteem, self-confidence, personal dignity, harm to his personal and professional reputations, stress and anxiety, and emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

175.   The City's actions in violation of state law were grossly negligent, and thus, Plaintiff is entitled to an award of punitive damages.

## DEMAND FOR A JURY TRIAL

176.   Plaintiff demands a trial by jury of all issues and claims in this action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

a.   Enter a judgment declaring that the practices of Defendants complained of herein are unlawful and in violation of the aforementioned sections of the United States Constitution and New York laws;

b.   Grant preliminary and permanent injunctions against Defendants and their officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

c.      Issue an order restraining Defendants and their officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from any retaliation against Plaintiff for participation in this litigation;

d.      Grant an award of damages in an amount to be determined at trial to compensate Plaintiff for all monetary and/or economic damages in connection with his claims, whether legal or equitable in nature, including lost income, lost earning capacity, and any other damages for lost compensation or employee benefits that Plaintiff would have received but for the Defendants' unconstitutional conduct, as well as the value of Plaintiff's property that City Defendants seized and failed to return to him, or, if returned, compensation to the extent such property was damages while in City Defendants' possession;

e.      Grant an award of damages to be determined at trial to compensate Plaintiff for harm to his professional and personal reputation;

f.      Grant an award of damages to be determined at trial to compensate Plaintiff for emotional distress and/or mental anguish in connection with his claims;

g.      Grant an award of punitive damages, to the extent permitted by law, in an amount commensurate with the Individual Defendants' ability to pay, so as to deter future malicious, reckless, and/or intentional unconstitutional conduct;

h.      Grant an award of damages to be determined at trial to compensate Plaintiff for presumed damages available under all applicable Federal laws;

i.      Issue a Writ of Mandamus requiring Defendants to reinstate Plaintiff's license and return Plaintiff's license, five handguns, and all other property seized from him by City Defendants in connection with the underlying events described in this case;

j.      Issue a Declaration that 38 RCNY § 5-30(d) (2018) was unconstitutional, either facially or

as applied;

k.      Award Plaintiff his reasonable attorneys' fees, as well as his costs and disbursements

incurred in connection with this action, including expert fees and other costs;

l.       Award Plaintiff pre-judgment and post-judgment interest, as provided by law; and

m.      Award such other and further legal and equitable relief as this Court finds necessary and

proper.

Dated: Garden City, New York
          June 7, 2023

Respectfully submitted,

BORRELLI & ASSOCIATES, P.L.L.C.
*Attorneys for Plaintiff*
910 Franklin Avenue, Suite 200
Garden City, New York 11530
Tel. (516) 248-5550
Fax. (516) 248-6027

By:     _____

ANDREW C. WEISS (5560537)
ALEXANDER COLEMAN (AC 8151)
MICHAEL J. BORRELLI (MB 8533)